

# NUMBER 13-23-00176-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MICHAEL NEUMAN, INDIVIDUALLY
AND DERIVATIVELY ON BEHALF OF
ROCKPORT AREA ASSOCIATION OF
REALTORS, INC.,                                          Appellant,

v.

KEITH HAMILTON, GEMMA ANTHONY,
AND JENNIFER BRADSHAW, AS
EXECUTIVE OFFICERS AND MEMBERS
OF THE BOARD OF DIRECTORS OF THE
ROCKPORT AREA ASSOCIATION OF
REALTORS, INC.,                                          Appellees.

## On appeal from the 36th District Court
## of Aransas County, Texas.

# DISSENTING MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina**
**Dissenting Memorandum Opinion by Justice Benavides**

"The right to speak freely and to promote a diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Ashton v. Kentucky*, 384 U.S. 195, 199 (1966). The majority holds that the communications at issue constitute a private dispute between private parties affecting their individual interests, and they therefore were not made in connection with a matter of public concern. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). In my opinion, this holding comes from a misreading of *McLane Champions* and *Creative Oil*, as well as a fundamental misunderstanding of the TCPA and its purpose. Because I would conclude that the Board's lawsuit is based on or in response to Neuman's exercise of his right to free speech, and because the Board has not sufficiently demonstrated the merits of its lawsuit, I respectfully dissent.

## I. BACKGROUND

At no point does the majority detail the statements underpinning the Board's defamation claim. Instead, the majority solely relies on the Board's description of Neuman's communications, rather than focus on the communications themselves. *But see Clinical Pathology Lab'ys, Inc. v. Polo*, 632 S.W.3d 35, 48 (Tex. App.—El Paso 2020, pet. denied) ("[T]he focus must be on the communications themselves, and whether they were made in connection with a [matter of public concern]."). Because we are obliged to consider more than just the parties' pleadings when determining whether the TCPA applies, additional background information is necessary. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a).

By all accounts, on September 12, 2022, RAAR held a board meeting. During the months of October, November, and December 2022, Neuman sent a string of emails to

2

RAAR's membership.[1] In his first email, sent on October 14, 2022, Neuman asserted, "In my opinion, [the board meeting] is a Kangaroo court and not a meeting to express or discuss the input and opinion[s] of the members for the benefit of the members. It is a one-man show." Neuman also discussed certain events that transpired at the September board meeting, stating, "[M]embers asked who is on the finance committee and who looks after the budget income and expenses. . . . Mr. Keith Hamilton stated that Larry Barnebey is the Finance Committee chair. Judy Bell asked if he was the only one, but Mr. Hamilton evaded the question." Neuman represented that a couple days after the meeting, several of his "brokerage [r]ealtors" were having lunch when they ran into Barnebey. After one of the realtors expressed that she wanted to volunteer for the finance committee, Barnebey allegedly stated, "Honey, it is all under control. I don't need your help[.]" Neuman also detailed some concerns about RAAR's finances, such as the fact that RAAR "paid property taxes in the amount of $100,000.00 plus to the county but did not file the building ownership as a nonprofit." Neuman suggested that "we look at all options available to the board and the MLS[2] [and] restructure the organization accordingly."

In his second email, sent on October 17, 2022, Neuman further discussed the details of the September board meeting. He explained that "the MLS committee" recommended "that RAAR MLS join with South Texas MLS to save time and money for members of RAAR." However, according to Neuman, Hamilton did not want to "improve

---

[1] These emails were attached to the Board's response to Neuman's TCPA motion to dismiss. I have omitted any emphasis, such as bolding and underlining, from the original emails in my republishing of them.

[2] MLS refers to the Multiple Listing Service.

the Realtor's [sic] needs. Is this the leadership we want?" Neuman also complained that instead of allowing the membership to vote on transitioning to a new MLS technology, "Hamilton created an ad-hoc committee (handpicked) at the September meeting in a disruptive, insulting[,] and discriminating [manner] towards me." Neuman represented that "Hamilton and a few of these members' agenda is to stop and disrupt the process thus stopping the opportunity for members to make choices."

On October 18, 2022, the Board's attorney sent a cease-and-desist letter to Neuman's attorneys. According to this letter, "Neuman, Judy Bell[,] and others with Realty Executives have engaged in defamatory, disparaging, intimidating, and unlawful conduct against RAAR and its individual [b]oard members and employees, by falsely and recklessly providing misinformation relating to RAAR." The letter requested that Neuman cease his wrongful conduct, or else the Board intended to seek legal remedies.

In the third email, sent on October 19, 2022, Neuman stated, "I have some concerns about how the RAAR conducts our business, meaning Realtor Association business. Many items, including accountability and record keeping, I believe that as paying members, we should be questioning and voicing our concerns." Neuman represented that he received a response from Gina Setterbo, RAAR's account executive, who explained that RAAR's finance committee "and RAAR accountant only meet once a year to discuss and review the proposed budget for the following year." Neuman expressed that he "was surprised to learn that the Finance Committee meets only once a year." Neuman further suggested, "Surely Mr. Barnebey could meet with the board more than once per year to oversee the administration of the financial affairs of the RAAR—a

4

monthly meeting would be more appropriate, particularly if Mr. Barnebey is in a paid position." In response to this email, the Board's attorney sent a cease-and-desist email that same day to Neuman's attorneys.

On October 21, 2022, Neuman sent another email to RAAR's membership. In this email, he acknowledged that he was "being threatened with TRO lawsuits to silence me" but explained that he was "simply pointing out truth and facts." Neuman also stated that "Rockport has a reputation for not having the Realtors' needs at the forefront. That has been caused by a few characters." Neuman concluded by stating, "I've taken this issue upon myself because the leadership of RAAR has failed the Realtors and most of our clients, the sellers and buyers."

On November 10, 2022, Neuman sent another email, requesting "all RAAR members to please step up and express your concerns and issues to the leadership and to take an active role in correcting the abuse you've seen through the years." He harkened back to the September board meeting, stating, "When Mr. Hamilton shut us down, insulted, and discriminated against me and the Chairman of the South Texas MLS, the presentation from the South Texas MLS was halted."

On November 14, 2022, Neuman sent another email accusing the Board of not being transparent, "trying to stop" him, and "wasting members' hard-earned money." On November 18, 2022, Neuman sent an email purporting to include the feedback he had received from his fellow RAAR members. The following are some of the statements Neuman allegedly received from other RAAR members:

- Mr. Hamilton should step down from his position because he is not qualified to serve on this board. For two years, this board has been

5

riddled with issues, member dissatisfaction, and antitrust violations. Disparaging me, my company, and other agents[.] I am not going to disclose everything yet, but it will come to light if we go to court.

- Mr. Hamilton, do the right thing. You have been a dictator and a distraction on this board for way too long.

- I support [Neuman] and I'm sorry he was humiliated, intimated [sic], embarrassed, and discriminated against. RAAR created a HOSTILE ENVIRONMENT, and this should not be tolerated[.] I hope there will be some swift[] and firm legal action to regain the integrity.

- Thank you for your efforts and your desire to see this through. It sounds like RAAR doesn't want to go to court and doesn't want a forensic audit of the books. Hmmm . . . wonder why?

On December 2, 2022, Neuman filed an original petition in the underlying cause and requested a declaratory judgment defining the scope of RAAR members' privileges. Attached to Neuman's petition and incorporated by reference were RAAR's bylaws.

On December 7, 2022, Neuman sent another email to the membership and accused "a few of the RAAR members in leadership positions" of "manag[ing] RAAR as their private conglomerate." And on December 22, 2022, Neuman sent his final email, explaining that his lawsuit was filed against the "three leaders, the President, the Vice President, and the Secretary who happens to be on the Board of Directors. Not the entire BOD as they keep telling everyone." Neuman also alleged that "[e]very other board has open and clear communications with their membership except for RAAR." Neuman explained that he was "looking into filing an Antitrust complaint against the Board with the DOJ," and asked the members whether they could "trust the RAAR to protect our profession."

On December 29, 2022, the Board filed a general denial and counterclaimed for

6

defamation. According to the counterclaim, Neuman has "been constantly emailing and contacting RAAR members making statements and comments that completely mischaracterized events at the RAAR Board meeting on September 12, 2022[,] and afterwards and accusing Defendants of discrimination and intentional humiliation of Plaintiffs." The Board sought actual damages and "a [d]eclaratory [j]udgment for [Neuman] to Cease and Desist from engaging in any further wrongful conduct."

On February 21, 2023, Neuman filed his TCPA motion to dismiss in response to the defamation counterclaim, asserting that his rights to petition, to associate, and to free speech were all implicated by the counterclaim. In their response filed on March 22, 2023, the Board contended that their defamation action did not implicate any of these rights because Neuman's communications did not relate to a matter of public concern, a governmental proceeding, or a judicial proceeding. The Board also described Neuman's allegedly defamatory conduct as follows:

> [Neuman] ha[s] been constantly emailing and contacting RAAR members making statements and comments that completely mischaracterized the events at the RAAR Board meeting on September 12, 2022, and afterwards, accusing [RAAR] of discrimination and intentional humiliation of Mr. Neuman and his associates, and stating as fact that the RAAR in general and specific members are behaving unethically. . . . False accusations raised by Neuman include allegations that RAAR is engaging in antitrust violations, disparaging Mr. Neuman[ ]and his company, breaching fiduciary duties, failing to act transparently, wasting association financial resources, abusing its authority, and other such misconduct.

The trial court denied Neuman's motion to dismiss, found that it was frivolously filed, and awarded RAAR's board members attorney's fees. This accelerated, interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(12).

## II. THE HISTORY OF THE TCPA

Because a primary purpose of the TCPA is "to encourage and safeguard the constitutional rights of persons to . . . speak freely," it is important to analyze what speaking freely has historically entailed. *See id.* § 27.002.

### A. The Freedom of Speech, Generally Speaking

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I; *see* TEX. CONST. art. I, § 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."). Although the freedom of speech is referred to as "the very foundation of constitutional government," *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937), limitations have commonly been understood to apply to it. In *Chaplinsky v. New Hampshire*, the United States Supreme Court explained that "[t]here are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . ." 315 U.S. 568, 571–72 (1942). *But see Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 695 (1990) (Scalia, J., dissenting) ("[T]here is no such thing as too much speech . . . .").

Nonetheless, "[t]he freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public

8

concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940). In other words, "[f]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967) (quoting *Thornhill*, 310 U.S. at 102). Therefore, protected speech includes more than just "political expression or comment[s] upon public affairs, essential as those are to healthy government." *Id.*

Since its admission into the union, Texas has developed its own free speech jurisprudence. In the early years, under common law, individuals sued for libel in Texas enjoyed a "privilege," or could essentially escape liability, if the alleged communication was "made in good faith, in reference to a matter in which the person communicating ha[d] an interest, or in which the public has an interest . . . if made to another for the purpose of protecting that intent." *Mo. Pac. Ry. Co. v. Richmond*, 11 S.W. 555, 557 (Tex. 1889).

In *Missouri Pacific Railway Co. v. Richmond*, a railway officer fired Richmond, a conductor, and subsequently circulated material among "the officers of the company only," explaining that Richmond had been discharged for "carelessness." *Id.* at 555. A private dispute between private parties affecting solely their pecuniary interests. Under the broad, then-existing common-law jurisprudence, the Texas Supreme Court held that the railway officer enjoyed a privilege, stating, "looking to the public interests involved, we do not see that such a publication would be actionable." *Id.* at 558. The Court considered the "public interests involved in the safe operation of railways" and "the interests of their

9

owners," and it concluded that Richmond could not recover damages for the allegedly libelous material. *Id.*

**B.    SLAPPs & Anti-SLAPP Laws**

In the 1980's and 1990's, an alarming trend arose. Citizens were being sued in large swaths for speaking out on issues of public importance. *See* Chad Baruch, *"If I Had a Hammer": Defending SLAPP Suits in Texas*, 3 TEX. WESLEYAN L. REV. 55 (1996) [hereinafter *"If I Had a Hammer"*]; Sharlene A. McEvoy, *"The Big Chill": Business Use of the Tort of Defamation to Discharge the Exercise of First Amendment Rights*, 17 HASTINGS CONST. L.Q. 503 (1990). The United States Supreme Court has recognized that "[a] lawsuit no doubt may be used . . . as a powerful instrument of coercion or retaliation." *Bill Johnson's Rests., Inc. v. Nat'l Lab. Rels. Bd.*, 461 U.S. 731, 741 (1983). And this was no less true in these suits. Even if the citizen was ultimately successful in defending against the suit, the plaintiff's goal of silencing the citizen was often accomplished through the cost of the litigation. *See "If I Had a Hammer"*, *supra*, at 56. As one jurist remarked of this trend, "Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined." *Gordone v. Marrone*, 590 N.Y.S. 2d 649, 656 (N.Y. Sup. 1992), *aff'd*, 616 N.Y.S.2d 98 (App. Div. 1994).

George W. Pring and Penelope Canan are credited with coining the term "SLAPP," which stands for strategic lawsuits against public participation. *See Serafine v. Blunt*, 466 S.W.3d 352, 365 n.5 (Tex. App.—Austin 2015, no pet.) (Pemberton, J., concurring). According to Canan and Pring, the "warning signals" of a SLAPP suit include:

1.    Local issues (which cause SLAPPs more frequently than grander-scale or national issues);

10

2. Bi-polarity (sharply two-sided, go/no-go, win-lose positioning of parties);

3. Public-private dichotomy (one side viewing the issues from a public-good, ideological, or value perspective, while the other side views the issues as private, property rights, personal financial gain, etc.);

4. Non-Goliaths (contrary to expectation, filers are more often small, local entities and individuals, rather than large operators);

5. Legitimizing-delegitimizing labels (potential filers typically delegitimize their opponents by labeling them as "ignorant," "self-interested," "little old persons in tennis shoes," "opportunists," etc., while they legitimize themselves as "professional," "free enterprise," "having rights," "protecting property," etc.);

6. Forum bias (SLAPPs are typically filed by "losers," by those who mistrust their ability to win in the public, political forum in which the dispute starts—be it a zoning board, consumer agency, school board, police conduct review body, or law-reform lawsuit; ironically, it is when citizens are being most successful in the political forum that they are most frequently SLAPPed out of it and into court).

George W. Pring & Penelope Canan, *"Strategic Lawsuits Against Public Participation" ("SLAPPS"): An Introduction for Bench, Bar and Bystanders*, 12 BRIDGEPORT L. REV. 937, 948–49 (1992).[3]

In response to these suits, states began to pass anti-SLAPP laws. Thirty-three states and the District of Columbia have all passed anti-SLAPP laws that aim to swiftly dismiss SLAPPs and stem the damage done to the citizen's exercise of their core First Amendment rights. *See* Laura Lee Prather, *SLAPP Suits: An Encroachment on Human Rights of a Global Proportion & What Can Be Done About It*, 22 NW. J. HUM RTS. 49, 57 (2023).

---

[3] It is striking that most, if not all, of these "warning signals" of a SLAPP are present in this case.

11

## C. The TCPA

Texas's anti-SLAPP law, the TCPA, was enacted in 2011. *See, e.g.*, Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 962, *amended by* Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 5, 2019 Tex. Gen. Laws 684–85. "The [TCPA] is a bulwark against retaliatory lawsuits meant to intimidate or silence citizens on matters of public concern." *Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376 (Tex. 2019). The Act's purpose has remained the same since its inception; namely, "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. "We construe the TCPA liberally to effectuate its purpose and intent fully." *Buzbee v. Clear Channel Outdoor, LLC*, 616 S.W.3d 14, 26 (Tex. App.—Houston [14th Dist.] 2020, no pet.). If a defendant believes his First Amendment rights are being stifled by the claim filed against him, he may file a motion to dismiss under the TCPA. TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a).

"A two-step process is initiated by motion of a defendant who believes that the lawsuit responds to the defendant's valid exercise of First Amendment rights." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). Under the first step, the defendant-movant must show that the claim against him "is based on or is in response to [his] exercise of the right of free speech, right to petition, or right of association." TEX. CIV. PRAC. & REM. CODE ANN. § 27.003(a); *Winstead PC v. Moore*, 633 S.W.3d 200, 203 (Tex. App.—Dallas 2021, pet. denied). In determining whether the TCPA applies to a plaintiff's

12

claims, "the court shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a).

If the movant shows that a core First Amendment right is implicated by the non-movant's suit, "the trial court must dismiss the lawsuit unless the non-movant 'establishes by clear and specific evidence a prima facie case for each essential element of the claim in question.'" *Buzbee*, 616 S.W.3d at 26 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)). If the non-movant then satisfies this second step of the TCPA, the trial court must deny the motion to dismiss unless "the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d). "We consider de novo the legal questions of whether the Act applies and whether a non-movant has presented clear and specific evidence establishing a prima facie case of each essential element of the challenged claims." *Buzbee*, 616 S.W.3d at 26.

The initial version of the TCPA contained the same definition of "[e]xercise of the right of free speech" as the contemporary version. Specifically, it "means a communication made in connection with a matter of public concern." *Compare* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 962 (amended 2019), *with* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3). However, the prior version of the TCPA provided that a "matter of public concern" included issues relating to:

(A)     health or safety;

13

(B)     environmental, economic, or community well-being;

(C)     the government;

(D)     a public official or public figure; or

(E)     a good, product, or service in the marketplace.

Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 962 (amended 2019).

The Texas Supreme Court has historically interpreted the TCPA's provisions broadly. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (per curiam) (encouraging courts not to "improperly narrow[] the scope of the TCPA by ignoring the Act's plain language"). In *Lippincott v. Whisenhunt*, Whisenhunt, a nurse anesthetist, sued a medical facility's administrators for, among other things, defamation. 462 S.W.3d 507, 509 (Tex. 2015) (per curiam). Whisenhunt alleged that the administrators circulated emails with disparaging comments about Whisenhunt. *Id.* at 508. These allegations "included claims that Whisenhunt 'failed to provide adequate coverage for pediatric cases,' administered a 'different narcotic than was ordered prior to pre-op or patient consent being completed,' falsified a scrub tech record on multiple occasions, and violated the company's sterile protocol policy." *Id.* at 510. The supreme court concluded that "the provision of medical services by a health care professional constitutes a matter of public concern." *Id.* (citing *Neely v. Wilson*, 418 S.W.3d 52, 70 n.12 & 26 (Tex. 2013)). Accordingly, it held that the TCPA applied to Whisenhunt's claims. *Id.*

In *ExxonMobil Pipline Co. v. Coleman*, Coleman, "a terminal technician" at ExxonMobil, "was assigned to perform preventative maintenance tasks, offload

14

shipments from incoming trucks, and record the fluid volume of various petroleum products and additives in storage tanks each night, a process referred to as 'gauging the tanks.'" 512 S.W.3d at 897. Coleman was accused by two of his supervisors of "fail[ing] to gauge tank 7840 on August 20, 2012, yet report[ing] that he did." *Id.* He was subsequently terminated. *Id.* Coleman sued his supervisors for defamation. *Id.* In a per curiam opinion, the supreme court held that the supervisors' statements "were made in the exercise of the right of free speech under the TCPA," and "[t]hus, the TCPA applies." *Id.* at 901–02.

The main point I make by discussing these cases is this: It is easy to cast these cases in a light that results in them coming out the other way under the majority's reasoning. These were private citizens criticizing other private citizens for failures made in the course of their employment—something that, by definition, affects the parties' pecuniary interests. But the supreme court held that these seemingly private communications were nonetheless matters of public concern deserving of the TCPA's protection. *See id.*; *Lippincott*, 462 S.W.3d at 510.

### III.    THE CURRENT TCPA AND THIS CASE

I will now address the current version of the TCPA and how it impacts the case at hand.

### A.    Interpreting the Current TCPA

"Statutory construction is a legal question we review de novo." *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). "Our primary objective when construing a statute is to ascertain and give effect to the Legislature's intent." *Tex. Dep't of Transp. v.*

15

*City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004). In interpreting an undefined term, we construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context, or unless the construction leads to absurd results. *Hughes*, 246 S.W.3d at 625–26.

This case turns on the meaning of "matter of public concern." The TCPA's new definition of "matter of public concern" tracks, to the detriment of the statute's clarity, the Supreme Court's language in *Snyder v. Phelps*. 562 U.S. 443, 453 (2011). *See* Amy Bresnen et al., *Targeting the Texas Citizen Participation Act: The 2019 Texas Legislature's Amendments to a Most Consequential Law*, 52 ST. MARY'S L.J. 53, 86 (2020) ("The new statutory language in Sections 27.001(7)(B) and (C) is nearly identical to language in the *Snyder* Court's holding[.]"). In *Snyder*, the Court explained, "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public,' . . . ." 562 U.S. at 453 (citations omitted).

The Legislature chose not to require a "matter of public concern" to be "a subject of legitimate news interest" or "a subject of general interest . . . to the public". *Compare Snyder*, 562 U.S. at 453, *with* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(C). Rather, the TCPA now provides that a "matter of public concern" means a statement regarding:

(A)    a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;

(B)    a matter of political, social, or other interest to the community; or

16

(C)     a subject of concern to the public.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7).

What I glean from the Legislature's decision to borrow language from the *Snyder* decision is that other facets of its holding may also be instructive in determining whether a particular communication involves a matter of public concern. To that end, the *Snyder* Court further held that "[d]eciding whether speech is of public or private concern requires us to examine the 'content, form and context' of that speech, 'as revealed by the whole record.'" *Id.* (cleaned up) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (plurality op.)); *see Hayman v. Khan*, No. 14-20-00745-CV, 2023 WL 4873248, at *3 (Tex. App.—Houston [14th Dist.] Aug. 1, 2023, no pet.) (analyzing the "context, form, and context" of speech "as revealed by the whole record" to determine whether the TCPA applied to a claim (citing *Snyder*, 562 U.S. at 453)). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 472 U.S. at 454.

The "content" of Neuman's emails vacillates. For instance, at times, Neuman accuses certain board members of criminal and otherwise fraudulent activity. At other times, the scope of Neuman's emails is niche, referring to RAAR's bylaws, its internal operating procedures, and other minutiae. But overall, the message that formed the basis of the Board's complaint is clear—Neuman told others that RAAR's board members are corrupt. Specifically, the Board accused Neuman of making

false allegations that [the Board] engaged in discrimination, intentional

17

> humiliation of [Neuman], unethical behavior, antitrust violations, disparagement of [Neuman], breach of their fiduciary duties as officers and board members, abuse of authority, failing to act transparently, wasting RAAR financial resources, and other such allegations.

Antitrust violations are criminal acts under state law, punishable by up to three years in prison and by a fine of up to $5,000. *See* TEX. BUS. & COM. CODE ANN. § 15.22(a). "[A]ccusations that a person engaged in criminal conduct is considered a matter of public interest under the TCPA." *Whitelock v. Stewart*, 661 S.W.3d 583, 597 (Tex. App.—El Paso 2023, pet. denied); *see Garcia v. Semler*, 663 S.W.3d 270, 281 (Tex. App.—Dallas 2022, no pet.) ("It is well-settled that even after the 2019 amendments, 'criminal acts are matters of public concern.'" (quoting *Austin v. Amundson*, No. 05-22-00066-CV, 2022 WL 16945911, at *3 (Tex. App.—Dallas Nov. 15, 2022, no pet.) (mem. op.))); *see also Lyden v. Aldridge*, 2023 WL 6631528, at *3 (Tex. App.—Fort Worth Oct. 12, 2023, no pet.) (mem. op.) ("By taking the position that the alleged communication at the heart of his lawsuit constitutes an accusation of criminal conduct, Aldridge has, in effect, conceded that it involved a matter of public concern . . . ."). And "courts have held that communications accusing an individual of fraudulent activity can be considered a matter of public concern for purposes of the TCPA." *Whitelock*, 661 S.W.3d at 597 (collecting cases). In addition to accusing the Board of criminal and fraudulent activity, Neuman also threatened to share his concerns with the Department of Justice. *See Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 280 (Tex. App.—Tyler 2021, pet. denied) (explaining that appellee's threat to go to the media with certain concerns "further bolster[ed] the connection with the communications and the community's interest in the venture and its dissolution").

18

I will analyze the "context" and "form" of the communications together. Neuman disseminated the communications at issue via an email listserv. Neuman sent several lengthy emails to the listserv throughout the months of October, November, and December of 2022. The record reveals that this listserv consisted of RAAR's membership—approximately 300 real estate professionals.

I would hold that Neuman's communications were "made in connection with a matter of public concern" because they regard "a matter of political, social, or other interest to the community." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7)(B). "Statutory history concerns *how the law changed*, which can help clarify *what the law means*." *Brown v. City of Houston*, 660 S.W.3d 749, 755 (Tex. 2023). As noted, the prior version of the statute defined matter of public concern to include "an issue related to . . . environmental, economic, or *community* well-being." *See* Act of May 20, 2019, 86th Leg., R.S., ch. 378, § 3 2019 Tex. Gen. Laws 684 (emphasis added). In *Adams v. Starside Custom Builders, LLC*, the supreme court interpreted this provision as it pertained to a lone resident's complaints about a neighborhood developer and the HOA. 547 S.W.3d 890, 891 (Tex. 2018). The resident, Adams, posted allegedly defamatory communications to a blog and emailed other allegedly defamatory communications to the HOA president, residents of the neighborhood, and the builders of the local development. *Id.* at 893. In these communications, Adams accused the HOA and the neighborhood developer of various fraudulent and criminal activity, of cutting down trees, and of making "life miserable for all involved." *Id.* In interpreting the TCPA, the supreme court held that "[t]he allegation that a neighborhood developer and the HOA it controls have chopped down

19

residents' trees, generally made life miserable for the residents, and engaged in unspecified other corrupt or criminal activity is of public concern for the residents of the neighborhood." *Id.* at 897. The *Adams* court further theorized that, "in the context of a small residential neighborhood community . . . , any allegation of malfeasance and criminality by the developer and the HOA likely concerns the well-being of the community as a whole" since HOAs "wield substantial, quasi-governmental powers in many neighborhoods." *Id.* at 896.

Like the HOA in *Adams*, RAAR also wields quasi-governmental authority. Attached to Neuman's petition and incorporated by reference were RAAR's bylaws, which indicate that the association, in conjunction with NAAR, holds the trademarks for the terms "realtor" and "realtors." Because of this, RAAR has the "authority to control, jointly and in full cooperation with" NAAR the use of the terms "realtor" and "realtors" within its jurisdiction.[4] The bylaws further explain that its members in good standing "shall have the privilege of using the terms [realtor] and [realtors] in connection with their places of business within the state or a state contiguous thereto so long as they remain [realtor] members in good standing. No other class of members shall have this privilege." In other words, RAAR holds a monopoly on whether real estate professionals working in Aransas County may rightfully call themselves "realtors." It may be reasonably assumed that a real estate professional's inability to wear the mantle of "realtor" could affect his livelihood.

Additionally, just as an HOA promulgates rules and restrictions for its residents, RAAR does the same. Applicants seeking RAAR membership must, among other things,

---

[4] The bylaws explain that RAAR's jurisdiction is "all of Aransas County."

20

maintain a valid real estate broker's license (or other similar licensure), have "no record of official sanctions involving unprofessional conduct," and, upon request, pass a written examination if RAAR's membership committee determines such an examination is necessary. An applicant who becomes a RAAR member may still "be reprimanded, fined, placed on probation, suspended, or expelled by the Board of Directors" if, after a hearing, the member is found to have violated RAAR's bylaws or a rule the association adopted that does not conflict with its bylaws.

Two of our sister courts have split on the precedential value of *Adams*, given the intervening legislative amendments to the TCPA. *Compare Rivas v. Lake Shore Cmty. Ass'n*, No. 01-22-00121-CV, 2023 WL 3063409, at *13 (Tex. App.—Houston [1st Dist.] Apr. 25, 2023, no pet.) (mem. op.) (concluding that the holding in *Adams* only applied to "the former version of the TCPA, which applied a less exacting standard and included a broader definition of the phrase a 'matter of public concern'"), *with Cobb Dev. v. McCabe*, No. 03-21-00524-CV, 2023 WL 4003513, at *6 n.6 (Tex. App.—Austin June 15, 2023, pet. filed) (explaining that, despite the intervening amendments to the TCPA, "*Adams* remains instructive because the supreme court made clear that Adams' allegation was a matter of public concern even if viewed 'apart from the non-exclusive statutory list.'" (quoting *Adams*, 547 S.W.3d at 896)).

I do not agree with the First Court of Appeals that the Legislature's amendment of the TCPA nullifies the precedential value of *Adams*'s interpretation of the term "community." "We presume the Legislature is aware of relevant case law when it enacts or modifies statutes." *In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (orig. proceeding). If

the Legislature wished to indicate that it disapproved of the supreme court's interpretation of the term "community" in *Adams*, it should not have reinserted the term "community" back into the statute without an express definition. *See Tex. Dep't of Fam. & Protective Servs. v. Mitchell*, 510 S.W.3d 199, 202 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("The Legislature can rectify a mistaken judicial interpretation, and if it does not do so, there is little reason for courts to reconsider a prior statutory construction."); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 255 (2012) ("The legislature, naturally, can change the law whose meaning the prior judicial interpretation established. But once that meaning *has* been established, the meaning cannot change 'in light of' a later statute with which a different meaning would be more compatible.").

Instead, the Legislature chose to define matters of public concern to include "a matter of political, social, or other interest to the *community*." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(B) (emphasis added). We should not judicially amend the statute in question to insert a different term in place of "community" when the Legislature itself declined to do so. Therefore, I would conclude that *Adams* is still instructive when interpreting the term "community" under the current version of the TCPA. And to that end, just as Adams's allegations of corruption were concerning to a "small residential neighborhood community," so too would Neuman's allegations of corruption be concerning to the local real estate community. *See* 547 S.W.3d at 896.

**B.      Commercial Speech; Distinguishing *McLane Champions* & *Creative Oil***

The majority relies on *Creative Oil* and *McLane Champions* to conclude that

22

Neuman's accusations were not relevant to a public audience. But the facts of those cases demonstrate that they do not warrant the conclusion the majority draws. In *Creative Oil*, a ranch entered into an oil and gas lease with Creative Oil. *Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 130 (Tex. 2019). Creative Oil sued the ranch for telling third-party purchasers that the lease had expired and that they should stop making payments on the lease. *Id.* The ranch filed a TCPA motion to dismiss. *Id.* The supreme court ultimately held that the motion to dismiss should not have been granted, explaining that "the communication about goods or services must have some relevance to a wider audience of potential buyers or sellers in the marketplace, as opposed to communications of relevance only to the parties to a particular transaction." *Id.* at 134. It further held that "[a] private contract dispute affecting only the fortunes of the parties involved is simply not a 'matter of public concern' under any tenable understanding of those words." *Id.* at 137.

In *McLane Champions*, the supreme court represented that the claims at issue were based "solely on private business negotiations in an arms-length transaction subject to a nondisclosure agreement." *McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 917 (Tex. 2023). Specifically, the suit focused on the rates that Comcast allegedly proposed to air certain sports games. *Id.* The Court referred to this claim as "a garden-variety fraud and breach-of-contract dispute between a private buyer and a private seller regarding statements made during a private negotiation." *Id.* at 919.

In my opinion, *Creative Oil*, *McLane Champions*, and the 2019 amendments were all attempts to better align Texas's TCPA jurisprudence with the United States Supreme

Court's jurisprudence on commercial speech. "Commercial speech is generally afforded less constitutional protection than other forms of constitutionally guaranteed expression." *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 456 (Tex. 2008). And commercial speech is defined as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); *see Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387, 394 (Tex. App.—Austin 2000, no pet.).

In *Dun & Bradstreet*, false information in an individual's credit report did not involve a matter of public concern as it "was speech solely in the individual interest of the speaker and its specific audience," although even that conclusion was only able to garner agreement among a plurality of justices. *See* 472 U.S. at 762. The United States Supreme Court noted that this type of speech was "solely motivated by the desire for profit, . . . . [and] was also more objectively verifiable than speech deserving of greater protection." *Id.* at 762.

In working on the 2019 amendments to the TCPA, legislative staff noted that "[s]ince its enactment in 2011, the broadly worded Texas anti-SLAPP law has been used to put an early end to lawsuits in which core constitutional rights have not been invaded, including cases involving trade secrets, employment non-compete agreements and lawyer disciplinary actions." House Research Organization, Bill Analysis, Tex. H.B. 2730, 86th Leg., R.S. (2019). As previously noted, the prior version of the TCPA included within its "matters of public concern" ambit "a good, product, or service in the marketplace." *See* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, § 2, 2011 Tex. Gen. Laws 962 (amended

24

2019). But the TCPA also includes a commercial speech exemption which provides that the TCPA does not apply to

> a legal action brought against a person engaged In the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer[.]

TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(a)(2).

While the exemption does not expressly state that statements are unprotected only when they are made in the defendant's capacity as a salesperson, "that is the only reasonable and logical construction of the exemption when considered within its statutory context." *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018). Courts had the difficult task of interpreting these two provisions together in a harmonious manner while they were both in effect. *See id.* at 690 ("[T]he commercial-speech exemption applies only to *certain* communications related to a good, product, or service in the marketplace . . . ."). But when the 2019 amendments rolled in, only the commercial speech exemption survived.

The distinction between commercial speech and other varieties of constitutionally protected speech is referred to as "common-sense," and the Supreme Court has listed as examples of commercial speech, *inter alia*, "the exchange of information about securities," "corporate proxy statements," and "the exchange of price and product information among competitors." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978). It is easy to see where price negotiations, *see McLane Champions*, 671 S.W.3d at 917, and discussion of payments on an oil lease, *see Creative Oil*, 591 S.W.3d at 130, fit in with

25

these less protected types of speech. But comparing the sophisticated, arms-length business dealings of private entities with Neuman's email rants to his fellow real estate professionals is like comparing chalk and cheese. In my opinion, it is far more logical to compare Neuman's communications to Adams's disgruntled emails and blog posts. *See Adams*, 547 S.W.3d at 893; *see also Patel v. Patel*, No. 14-18-00771-CV, 2020 WL 2120313, at *7 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.) (mem. op.) (interpreting the previous version of the TCPA and holding that allegations that a member of a non-profit's board of directors was mentally unfit and stole funds concerned "the well-being of the community the Foundation seeks to serve").

The Board asserts, and the majority seemingly agrees, that "[t]his private dispute merely affects the fortunes of the litigants," and that Neuman made "quintessentially private statements to a narrow group of private trade group members about an internecine conflict." It is unclear to me how Neuman's fortune could be affected by accusing the Board of corruption, other than via the Board's retaliation in bringing this lawsuit. The Board's assertion also ignores the interests of RAAR's members, who, as the Board attested in its pleading, "are extremely upset by [Neuman's] misleading and false communications." *See Miranda v. Byles*, 390 S.W.3d 543, 554 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ("A matter can be a public issue because people in the public are discussing it or because people other than the immediate participants in the controversy are likely to feel the impact of its resolution."). Although Neuman brought his claims both in his individual capacity and on behalf of RAAR as an association, no other individual members of RAAR were joined as parties to this dispute. Thus, by the Board's

26

own pleading, it is apparent that Neuman's communications were of interest to a wider audience than just the private parties involved. *See id.*

Ultimately, the statements Neuman made upon which the Board's claim is based concern corruption, criminal activity, and the perceived retaliation and discrimination against Neuman by the Board. These accusations are of interest both to RAAR's membership and to a broader, public audience. *See Adams*, 547 S.W.3d at 897; *see also Patel v. Patel*, 2020 WL 2120313, at *7. The TCPA demands a rigorous and fact-intensive de novo review. That is what I have applied here. And in doing so, I would conclude that Neuman met his burden to show that the Act applies to the Board's defamation claim.

## C.     Second TCPA Step

Under the second step of the TCPA, the plaintiff must show "by clear and specific evidence a prima facie case for each essential element of the claim in question" to avoid dismissal. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). "In a suit by a private person against a non-media defendant, the elements for a defamation claim are (1) the publication of a statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *Fawcett v. Rogers*, 492 S.W.3d 18, 25 (Tex. App.—Houston [1st Dist.] 2016, no pet.). "[W]hen a defamation plaintiff is a private individual, he must establish that the defendant acted negligently regarding the truth of the statement." *Day v. Fed'n of State Med. Bds. of the U.S.*, 579 S.W.3d 810, 822 (Tex. App.—San Antonio 2019, pet. denied). "In the defamation context, negligence is defined 'as the failure to investigate the truth or falsity of a statement before publication, and the failure to act as a reasonably prudent person.'"

*Id.* (quoting *Harwood v. Gilroy*, No. 04-16-00652-CV, 2017 WL 2791321, at *6 (Tex. App.—San Antonio June 28, 2017, no pet.) (mem. op.)). "In other words, the plaintiff must establish that the defendant knew or should have known that the defamatory statement was false." *Id.*

The Board does not discuss what "clear and specific evidence" demonstrates that Neuman "knew or should have known" that his statements were false. *See id.*; TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Nor does the Board actually allege that Neuman "knew or should have known" that his statements were false. *See Day*, 579 S.W.3d at 822. In its petition, the Board alleged that Neuman "recklessly" spread misinformation; it never alleged Neuman was negligent. *See Monsanto Co. v. Milam*, 494 S.W.2d 534, 536 (Tex. 1973) ("The specific allegation controls over the general allegation."). "Reckless disregard is a subjective standard, requiring evidence that" Neuman "entertained serious doubts as to the truth of the [communication] at the time it was published." *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005) (per curiam). But regardless of which liability standard we hold them to, the Board has not presented any evidence that Neuman's acted with the requisite degree of fault. Accordingly, its defamation claim should fail.

Additionally, many of Neuman's statements referred to less than the whole of the board. For instance, Neuman stated that "a few of the RAAR members in leadership positions" were engaging in practices that violated antitrust laws, but he did not identify which members he was accusing. If a statement does not concern a person, "it cannot defame them, nor can it injure their reputations." *Harvest House Publishers v. Loc. Church*, 190 S.W.3d 204, 213 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "Under

28

the group libel doctrine, a plaintiff has no cause of action for a defamatory statement directed to some or less than all of the group when there is nothing to single out the plaintiff." *Id.* To the extent that many of Neuman's communications do not identify to whom he is referring, the board members have failed to show that those communications concern them. *See id.* Based on the above, I would conclude that the Board has not met its burden to prove by clear and specific evidence a prima facie case for their defamation claim. I would sustain Neuman's sole issue.[5]

## IV. CONCLUSION

I agree with the majority that the TCPA's scope has narrowed, but I do not agree with the extent to which the majority narrows it. The Board's primary purpose in bringing this litigation is to silence Neuman, and the primary purpose of the TCPA is to prevent the Board from succeeding in doing so. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.002. The majority holds that allegations of criminal activity, corruption, humiliation, and discrimination enjoy no free speech protection in Texas. Because I cannot conclude that this is correct under any tenable reading of the TCPA, I respectfully dissent.

GINA M. BENAVIDES
Justice

Delivered and filed on the
29th day of February, 2024.

---

[5] Given this disposition, I would also conclude that the trial court's award of attorney's fees to the Board was in error, and I would remand to the trial court for a determination of whether Neuman is entitled to attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009 (describing when an award of attorney's fees is appropriate in the context of a TCPA motion to dismiss).

29